FILED

DEC 1 9 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIV

MICHAEL W. DOBBINS
ERK, U.S. DISTRICT C

1:11-cv-08980
Judge James F. Holderman
Magistrate Judge Jeffrey T. Gilbert

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATE OF ILLINOIS, *ex rel.* ALAN J. LITWILLER | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| OMNICARE, INC. | ) ) ) |
| Defendant. | ) |

**Hon. James F. Holderman**

COMPLAINT FILED **IN CAMERA**

**SEALED** PURSUANT TO 31 U.S.C. §3730(b)(2)

**JURY TRIAL DEMANDED**

## COMPLAINT AT LAW

Plaintiffs, the United States of America and the State of Illinois, *ex rel.* Alan J. Litwiller ("Relator"), by the undersigned attorneys, and for their Complaint against Omnicare, Inc. ("Omnicare" or "Defendant") allege as follows:

### INTRODUCTION

1.      This is an action by *qui tam* Relator Alan J. Litwiller, for damages and civil penalties on behalf of the United States of America and the State of Illinois (collectively referred to as "Plaintiffs"), arising from: (a) false statements and records made or caused to be made by Omnicare to the United States or its agents or intermediaries in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*; and (b) false statements and records made or caused to be made by Omnicare to the State of Illinois or its agents or intermediaries in violation of the Illinois False Claims Act ("IFCA"), 740 ILCS § 175/1, *et seq.*; and (c) violations of the Illinois Insurance Claims Fraud Prevention Act ("ICFPA"), 740 ILCS § 92/1, *et seq.*

2.      At all times relevant to this action, Omnicare has been primarily engaged in providing pharmaceutical products and services to nursing facilities through regional centers.

3.      Omnicare is an institutional pharmacy and one of the nation's largest providers of pharmaceutical products and services for the elderly.  Omnicare serves approximately 1.4 million residents in nursing facilities, long-term care facilities, assisted living communities, and other chronic care settings across the United States and in Canada.

4.      Nursing facilities contract with Omnicare to provide drugs and a variety of other pharmaceutical products and services to their patients.    Payments for Ominicare's pharmaceutical products and services can be made in a variety of ways, including  Medicare, Medicaid and other government funded health care program, private insurance or by patients directly.

5.      During the period of at least January 2009 through the present, Omnicare engaged in a series of schemes to offer and pay illegal inducements (including credits, rebates, payments, free services and discounted products and services) to its nursing facility clients to induce them to purchase or continue to purchase   products and services that were reimbursed through federal and state health care programs including Medicare and Medicaid.   In so doing, Omnicare violated Federal and State Anti-Kickback Statutes.

6.      In seeking reimbursement from Medicaid for its products and services, Omnicare was required to and did certify that it had complied with all applicable federal and state laws, including Anti-Kickback Statutes, on each claim submitted.  Each such certification was false, and therefore each claim submitted to Medicaid was false, because Omnicare in fact was in violation of the Anti-Kickback Statutes at the time of each relevant claim.  As a result, Omnicare received millions of dollars in payments from federal and state funds to which it was not entitled.

7.      The ICFPA prohibits knowingly offering or paying any remuneration directly or indirectly to induce any person to procure clients or patients to obtain benefits under a contract of

insurance. Omnicare's scheme of illegal inducements as set forth herein additionally violated the ICFPA and resulted in Omnicare receiving substantial payments from private insurers to which it was not entitled.

## PARTIES

8.      Omnicare is a Delaware corporation, with its principal place of business located in Covington, Kentucky.

9.      Relator is a citizen of the United States and a citizen of the State of Illinois, residing at 23663 W. Reuben, Plainfield, Illinois 60586.  From March 1997 to the present, Relator has been employed by Omnicare as a Customer Service and Support Consultant for its nursing facility clients.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as well as 31 U.S.C. § 3732 (a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

11.     The Court has personal jurisdiction over the Omnicare pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Omnicare can be found in and transacts business that is the subject matter of this lawsuit in this District.

12.     Venue in this District is proper under 31 U.S.C. § 3732(a) because Omnicare transacts business in this District and a substantial portion of the events at issue occurred in this District.

13.     As an employee of Omnicare with direct responsibility for consulting with the nursing facilities to whom Omnicare directed its improper inducements, Relator has direct, personal, and independent knowledge of the facts underlying the allegations of this Complaint.

14.     Relator brings this action for violations of the FCA on behalf of himself and the United States of America, pursuant to 31 U.S.C. § 3730(b)(1), and on behalf of himself and the State of Illinois, pursuant to the IFCA, 740 ILCS 175/4(b)(1) and ICFPA, 740 ILCS § 92/15.

15.     Under 31 U.S.C. § 3730(e), 740 ILCS 175/4(e)(3)(A) and 74 ILCS § 92/30(b) there has been no "public disclosure of allegations or transactions" on which this Complaint is based. Moreover, Relator is the "original source" of the information on which the allegations of this Complaint are based as defined in 31 U.S.C. § 3730(e)(4)(B), 740 ILCS § 175/4(e)(3)(B) and 740 ILCS § 92/30(b) even had such a public disclosure occurred. Relator has knowledge of the false statements and/or claims that Omnicare submitted, or caused to be submitted, to the Government as alleged herein.

16.     To the extent, if any, that this case is deemed to be a related action, and that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* action pending at the time of filing as prohibited in 31 U.S.C. § 3730(e)(3), 740 ILCS § 175/4(e)(3) or 740 ILCS 92/15(e), any factual allegations in common with either pending action that would cause this to be a related cause of action are hereby expressly excluded from this action, but only to the limited extent necessary to prevent such preemption.

17.     Furthermore, to the extent that the Court finds that any of the allegations or transactions set forth herein are based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States or the State of Illinois is already a party, if any such proceedings exist, then those allegations or

transactions are expressly excluded, but only for the specific time periods, specific companies, and specific allegations or transactions at issue in the other proceeding, and only to the extent the Court determines that Relator is not the original source.

## APPLICABLE ANTI-KICKBACK STATUTES

18.    The Federal Anti-Kickback Statute provides as follows:

> Whoever knowingly and willfully offers or pays any remunerations (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase [or] order, or arrange for or recommend purchasing [or] ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony . . .

42 U.S.C. § 1320a-7b(b)(2).

19.    The Federal Anti-Kickback Statute thus prohibits a pharmacy company from offering or paying any remuneration to a nursing facility (or its principals or agents), to induce the nursing facility to purchase pharmaceutical products, unless such payment or remuneration qualifies for one of a limited number of exceptions under the statute.

20.    No exceptions to the prohibition in Section 1370a-7b(3) of the Anti-Kickback Statute apply in this case.

21.    Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in Federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

22.    Illinois law similarly prohibits the offer or payment of remuneration or kickbacks in exchange for business or referrals for business.  For example, the Illinois Public Aid Code adopts the same language of the Federal Anti-Kickback Statute and makes it illegal for any person to

offe[r] or pa[y] any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase [or] order, or arrange for or recommend purchasing [or] or ordering any good, facility, service, or item for which payment may be made in whole or in part under this Code.

305 ILCS § 5/8A-3(b).

23.    No exceptions in Section 8A-3(c) of the anti-kickback provision in the Illinois Public Aid Code apply in this case.

24.    A person who violates this provision is guilty of a misdemeanor if the amount of the violation is under $150 and a felony of the amount is over $150.  305 ILCS § 5/8A-6.

## OMNICARE'S OPERATIONS

*Pharmaceutical Products*

25.    The largest and most profitable function Omnicare performs for its nursing facility clients is providing prescription medications to their patients.  Omnicare establishes pricing schedules for those medications and related pharmaceutical products.

*Pharmaceutical Services*

26.    In addition to the core function of providing pharmaceutical products, Omnicare also provides a wide array of pharmaceutical and other services to its nursing facility clients.

27.    Federal regulations require nursing facilities to employ or obtain the services of a licensed pharmacist who "(1) Provides consultation on all aspects of the provision of pharmaceutical services in the facility; (2) Establishes a system of records of receipt and disposition of all controlled drugs in sufficient detail to enable an accurate reconciliation; and (3) Determines that drug records are in order and that an account of all controlled drugs is maintained and periodically reconciled."  42 C.F.R. § 483.60.

28. As part of Omnicare's contractual relationships with its nursing facility clients, Omnicare agrees to provide pharmaceutical services to the nursing facility that meet or exceed the requirements of applicable state and federal regulations, including a licensed consulting pharmacist.

29. Omnicare's Consulting Pharmacists provide nursing facilities with a wide range of pharmaceutical services, including the direction and oversight on all aspects of the acquisition, disposition, handling, storage and administration of prescription medications and devices in the facilities. Consulting Pharmacists also review medical charts and provide comments and input to nurses or prescribing physicians.

30. Omnicare also provides Consulting Nurses to its nursing facility clients who perform the following services:

    a.    reviewing, cleaning and organizing medication carts;

    b.    ensuring that all medications needed are ordered and present prior to distribution during patient rounds;

    c.    participating in administering medications to patients;

    d.    reviewing and organizing medication rooms onsite at the various facilities; and

    e.    supervising and advising the facilities' nurses on medication administration.

31. Omnicare provides additional services to its nursing facility clients, including:

    a.    drug therapy management;

    b.    unit-of-use medication delivery systems for ease and accuracy for health care professionals and the residents they serve;

    c.       reimbursement specialists to add confidence and increased efficiency to infusion (I.V.) therapy;

    d.       customer service professionals for rapid response and 24/7 emergency service;

    e.       customized quality assurance, developed by teams of regulatory experts; and

    f.       compliance with all state and federal regulations, including OBRA-87 requirements for Medicare/Medicaid.

***OTC and Non-Prescription Products***

32.      In addition to pharmaceutical services, Omnicare provides its nursing facility customers with over-the-counter ("OTC") medications and other non-prescription products they are required to maintain, but that are not reimbursed by Medicare. Omnicare charges its nursing facility clients directly for these medications and products.

***Omnicare Billing to Nursing Facilities***

33.      Omnicare bills its nursing facility clients via monthly invoices. The invoices typically reflect three types of charges: (1) fees for pharmaceutical services rendered; (2) charges for OTC medications and other non-prescription products; and (3) charges for prescription medications for Medicare Part A patients, for which the facility is paid directly from Medicare.

34.      By far, the single most lucrative and profitable component of Omnicare's business is the provision of prescription medications. The profit margin on those products far exceeds the profit margin on the pharmaceutical services and the OTC or non-prescription products that Omnicare provides. As a result, it is in Omnicare's best interest to secure and obtain

continuing relationships with nursing facilities so it can continue to provide the highly profitable pharmaceutical medications to their patients.

**OMNICARE'S INDUCEMENT SCHEMES**

35.     In order to secure a continuing and lucrative stream of prescription medication business, Omnicare has developed and implemented a number of inducement schemes, as described below.

### *Forgiveness of Accounts Receivable*

36.     Although Omnicare submits invoices to its nursing facility clients on a monthly basis as described above, since as early as January of 2009 Omnicare at the direction of its Regional Vice President of Pharmacy Services for the Illinois Region, A. Samuel Enloe ("Enloe"), has engaged in a pattern and practice of agreeing to forego payment of those bills for many of its clients, in exchange for and as an inducement for the nursing facility and/or its patients to continue purchasing purchase lucrative prescription medications from Omnicare.

37.     As a result, Omnicare has permitted many nursing facilities with which it Omnicare does business in Illinois to amass substantial accounts receivables, often comprised in large part or entirely of charges for pharmaceutical services and non-prescription products.

38.     For example, one corporation with which Omnicare does business (referred to herein as "Client A"), owns and/or operates roughly 70 nursing facilities throughout the State of Illinois, all of which have entered into contracts with Omnicare.  Client A is one of Omnicare's largest clients.

39.     Omnicare has permitted Client A to amass over $6,000,000 in accounts receivable.

40.     Similarly, Omnicare does business with another company (referred to here as "Client B"), that owns and/or operates roughly six nursing facilities in Northern Illinois. Omnicare has permitted Client B to amass over $3,000,000 in accounts receivable.

41.     Enloe also happens to be a business partner with the principal owner of Client B, as they together own a web-based nursing facility training company.

42.     Similarly, another corporation with which Omnicare does business (referred to herein as "Client C"), is headquartered in Evanston, Illinois and operates nursing facilities that have entered into contracts with Omnicare.  Client C is a significant source of business for Omnicare.

43.     Omnicare has permitted Client C to amass over $3,000,000 in accounts receivable.

44.     Similarly, another corporation with which Omnicare does business (referred to herein as "Client D") owns and/or operates roughly five nursing facilities throughout central Illinois, all of which have entered into contracts with Omnicare.  Client D is a significant source of revenue for Omnicare.

45.     Omnicare has permitted Client D to amass over $1,000,000 in accounts receivable.

46.     Similarly, another  corporation with which Omnicare does business (referred to herein as "Client E"), currently owns and/or operates two nursing facilities in northern Illinois, all of which have entered into contracts with Omnicare.  In addition, Client E has in the past operated other nursing facilities that entered into contracts with Omnicare.  Client E is a significant source of revenue and business for Omnicare.

47.     Omnicare has permitted Client E to amass over $2,000,000 in accounts receivable.

48.     Instead of collecting these accounts receivable from Clients A-E, Omnicare has engaged in a pattern and practice of forgiving, expressly or implicitly, them for the purpose of inducing the clients to continue their relationships with Omnicare and continue to directly or indirectly (i.e. via their patients) purchase prescription medications from Omnicare.   Enloe has explicitly told one or more officers from Clients A-E that they need not worry about the accounts receivable, after making the determination that they are an acceptable sacrifice to ensure a continuing stream of prescription drug business in Illinois.  Omnicare made the determination that given the substantially more profitable prescription component of its business, it is more beneficial and profitable to Omnicare to offer this inducement in order to secure a steady continuing stream of business for its prescription medications, than to demand payment of these outstanding amounts and risk losing a component of its profitable business.

*Improper Discounts for Pharmaceutical Services*

49.     In October 2009, pursuant to a Consent Decree with the U.S. Department of Justice in settlement of prior lawsuits, Omnicare entered into an Amended and Restated Corporate Integrity Agreement ("CIA") with the Department of Justice.  The CIA set forth a variety of compliance best practices, training procedures, and audit procedures Omnicare was required to implement.   This included a requirement that Omnicare charge a fee for its pharmaceutical services of either $65 per hour for its Consultant Pharmacists, or $5.50 per bed, per month.

50.     Prior to this requirement, Omnicare had been charging Client B a flat fee of only $100 per month for all pharmaceutical services, which was nowhere near the fair market value of

the services being provided. Omnicare knew that switching to the newly required fee system would raise Client B's costs by several thousand dollars per month and jeopardize its relationship with that client. Rather than impose the newly required charges, Omnicare instead agreed to retain its prior arrangement with Client B in contravention of the Consent Decree and the CIA.

51.     Maintaining the old arrangement saved Client B several thousand dollars a month in pharmaceutical services over what Omnicare was required to charge it.

52.     Client F is a roughly 400 bed facility for developmentally disabled patients located in Chicago, Illinois. For several years prior to 2010, Omnicare provided pharmaceutical products and services to Client F. Prior to the Consent Decree, Omnicare had been charging Client F a nominal fee of $1 per bed, per month for pharmaceutical services. This was a profitable relationship for Omnicare with the substantial majority of the profit arising from the provision of prescription medications.

53.     Pursuant to Consent Decree, Omnicare was obligated to impose a charge of $5.50 per bed, per month for its provision of pharmaceutical services to Client F. In or around the Spring of 2010, Omnicare notified Client F of the impending change in the fee. In response, Client F sent Omnicare a notice of termination, as Client F had determined to get its pharmaceutical products and services from one of Omnicare's competitors.

54.     Upon learning this, Enloe and another Omnicare employee, Patrice Johnson, began negotiating with Client F in an effort to retain its business. As a result of these discussions, Omnicare agreed not to impose the newly required fee on Client F, and instead agreed to charge a lesser fee of $3 per bed, per month, a net savings of roughly $1,000 per month for the facility.

55.     For several years prior to 2010, Omnicare provided pharmaceutical medications and pharmaceutical services to another nursing facility, Client G, a 96 bed facility located in Springfield, Illinois.  Prior to the Consent Decree, Omnicare was charging Client G a fee of $1 per bed, per month for its provision of pharmaceutical services.  Because Omnicare made a substantial profit from its provision of prescription medications, this was still a very profitable relationship for Omnicare.

56.     Pursuant to Consent Decree, Omnicare was supposed to impose a charge of $5.50 per bed, per month for its provision of pharmaceutical services to Client G.

57.     Rather than risk losing Client G, Omnicare decided to forbear from imposing the required fee, and instead continued to charge the nominal fee of $1 per bed, per month, a net savings of roughly $400 per month for the facility.

58.     In contravention of the Consent Decree and CIA, Omnicare maintained their old pricing structure and/or entered into new, improper discount pharmacy service fee arrangements with Clients B, F and G to induce them to continue their business relationship with Omnicare and continue to directly or indirectly purchase prescription medications from Omnicare.   In doing so, Omnicare has made the determination that the additional pharmaceutical service fees are an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois.

***Improper Refunds and "Credits"***

59.     Client H is a roughly 200 bed facility located in Chicago, Illinois.   For several years prior to 2010, Omnicare provided pharmaceutical products and services to Client H.

60.     In or around October 2010, Omnicare learned that a competitor was soliciting Client H  to provide similar pharmaceutical products and services as Omnicare.

61.     In response to this threatened competition, Omnicare contacted Client H and claimed that it had conducted a review of its prior billing records, and determined that it had overcharged Client H roughly $60,000.    On information and belief, there was in fact no legitimate accounting basis for this "credit."

62.     Client I is a rehabilitation services company located in Lincolnwood, Illinois. Client I operates and/or controls at least eight nursing and rehabilitation facilities in Northern Illinois, and is responsible for selecting the company that provides pharmaceutical products and services at those facilities.    For several years prior to 2010, Client I had used Omnicare to provide those products and services.

63.     In or around October 2010, Omnicare learned that a competitor was soliciting Client I to provide the same or similar pharmaceutical products and services as Omnicare.

64.     In response to this threatened competition, Omnicare contacted the Vice President of Clinical Services for Client I and claimed that it had conducted a review of its records, and determined that Client I was entitled to a "credit" of $300,000.    On information and belief, there was in fact no legitimate accounting basis for this "credit."    After providing this credit, Enloe commented to two of his pharmacy managers that "this [the credit] should keep the Louise [Vice President of Client I] from leaving."

65.     For several years prior to 2010, Omnicare provided pharmaceutical products and services to another nursing facility, Client J, located in Park Ridge, Illinois.

66.     In or around September, 2010, Omnicare received a termination notice from Client J, after Client J had decided to have a competitor provide its pharmaceutical products and services.

14

67.     In response to this threatened competition, on September 23, 2010, Enloe emailed Client J and claimed that it had conducted a review of its records, and determined that Client J was entitled to a "credit" of $60,977.59.   On information and belief, there was in fact no legitimate accounting basis for this "credit."

68.     For several years prior to 2010, Omnicare provided pharmaceutical products  and services to another nursing facility, Client K, located in Rockford, Illinois.

69.     In or around September, 2010, Omnicare received a termination notice from Client K and learned that Client K was being solicited by a competitor pharmacy for the provision of the same or similar products and services that Omnicare had been providing.

70.     In response to this threatened competition, on September 23, 2010, Enloe, acting on behalf of Omnicare, contacted Client K by email and claimed that it had conducted a review of its records, and determined that Client K was entitled to a "credit" of $75,990.16.   On information and belief, there was in fact no legitimate accounting basis for this "credit."

71.     For several years prior to 2010, Omnicare provided pharmaceutical medications and pharmaceutical services to another nursing facility, Client L, located in Springfield, Illinois.

72.     Prior to the fall of 2008, Omnicare learned that Client L was considering terminating its relationship.

73.     Rather than risk losing this customer, in or around the fall of 2008, Enloe, acting on behalf of Omnicare, informed Client L that Omnicare had conducted an "audit" of its records, and determined that Client L was entitled to a "credit" of roughly $100,000.  On information and belief, there was in fact no legitimate accounting basis for this "credit."

74.     Omnicare issued the credits to Clients H-L as described above to induce them to continue their business relationships with Omnicare and continue to directly or indirectly

purchase prescription medications from Omnicare. In doing so, Omnicare has made the determination that the amount of the credits was an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois.

***Discounts and Subsidies for Third Party Services***

75.     In or around March 2009, Omnicare entered into a financial arrangement with SigmaCare, an electronic medical records management company located in New York, in which Omnicare would sell SigmaCare services and programs to Omnicare's existing nursing facility clients.  For at least the period of October 2009 through the present, Patrice Johnson, an employee of Omnicare, has promoted and sold SigmaCare products and services to nursing facilities throughout Illinois.

76.     On numerous occasions, Johnson offered SigmaCare at a substantial discount from regular prices to any nursing facility that would agree to enter into a fixed, multi-year agreement with Omnicare for the provision of pharmaceutical products and services.  This discount would either result in Omnicare receiving a decreased sales commission from SigmaCare, or Omnicare actually having to directly pay a portion of the cost for the SigmaCare services and programs.

77.     In or around November 2009, Enloe, on behalf of Omnicare, agreed to sell SigmaCare services to Client M at a substantial discount from regular prices in exchange for Client M's agreement to use Omnicare pharmaceutical products and services for a fixed period of seven years.  The discount Omnicare gave was so substantial that it not only negated Omnicare's commission from SigmaCare, but resulted in Omnicare having to pay SigmaCare for a substantial portion of the costs of that service to Client M.

78.     Omnicare offered the discounts and payments described above to induce nursing facility clients to enter into long-term agreements for the provision of pharmaceutical products and services. In doing so, Omnicare has made the determination that the direct or indirect costs of the discounts and/or payments are an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois.

***Free Consulting Services and Other Services***

79.     In November 2010, pursuant to the Consent Decree with the Department of Justice, Omnicare instituted a policy to charge $65 per hour for pharmacy and other consulting services that it provided to nursing facilities. Enloe contacted various officers of Omnicare in the corporate headquarters, including Pat Keefe, the then COO of Omnicare, and complained that this policy placed him at a competitive disadvantage in the Illinois region. Enloe then persuaded the officers to change the policy so that Omnicare would only charge this fee for services that were mandated by regulation. Any and all other consulting and advisory services that Omnicare provided to nursing facilities would be provided for free.

80.     For example, and as set forth above, Omnicare provides consulting services for each of its nursing facility clients on such matters as training and compliance on matters that do and do not implicate pharmaceutical regulations. Omnicare employs salaried individuals whose sole responsibility is to provide free training and compliance consulting services, seminars and other instructional or advisory services to its nursing facility clients. One consultant alone has presented over 450 programs for nursing facilities since 2009, many of which have nothing to do with the provision of pharmaceutical products or services.

81.     On a monthly basis, pharmacies that provide medications to nursing facilities submit computer generated physician order sheets to the facility for each resident that receives

medications. When the facility receives these sheets, they must compare them to the prior month's sheet for each resident to ensure that there are no discrepancies and that all of the information is current and accurate. This process is known as physician order sheet "recapping." It is an extremely time-consuming and detail-oriented process.

82. Omnicare hires a staff of over 20 full time Registered Nurses who provide this recapping service to certain nursing facility clients at no cost to the clients. Instead, Omnicare bears the full cost, including salaries and expenses.

83. Omnicare provides these consulting and recapping services to clients for free to induce them to continue their business relationships with Omnicare and continuing to directly or indirectly purchase prescription medications from Omnicare. In doing so, Omnicare has made the determination that the additional costs incurred are an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois.

***Omnicare Foundation***

84. For over twelve years, Omnicare has operated the Omnicare Foundation, which ostensibly was formed as a charitable organization. In the Illinois region, the Foundation's activities are administered by Vernon Gideon, a registered pharmacist in Omnicare of Northern Illinois. Mr. Gideon operates under the direction and instructions of Enloe.

85. During the last six years, various nursing facility clients of Omnicare have asked Enloe to have the Foundation make payments on the clients' behalf to various organizations or entities. Enloe mischaracterizes these payments as charitable contributions, when in many instances they are actually indirect payments to the owners of the nursing facilities.

86. For example, Client N, is an Illinois corporation that owns and operates numerous nursing facilities in northern and central Illinois. The owner of Client N is a friend of Enloe.

The owner's two sons are competitive racecar drivers, a very expensive hobby. For many years, Client N had used a competitor of Omnicare for its pharmaceutical products and services. In order to induce Client N to bring its business to Omnicare, Enloe offered to subsidize the expenses of the sons' racing activities through Foundation payments. The Foundation has in fact been making such payments as a specific inducement to obtain the business of Client N.

87. In addition, the owners of several nursing facility clients have requested that the Foundation make payments to the private schools their children attend. The owners requested that the Foundation make these payments to subsidize, or in some cases completely pay, the private school tuition of their children. Enloe has agreed to these requests and for many years has directed the Foundation to make these payments. Again, the purpose of these payments is to induce the clients to continue their business relationships with Omnicare and continue to directly or indirectly purchase prescription medications from Omnicare.

## MEDICAID AND MEDICARE PROGRAM AND PAYMENTS

88. As set forth above, payment for the pharmaceutical products and services rendered to nursing facility patients can come from Medicaid, Medicare Part A, Medicare Part D, other government funded health insurance programs, private insurers and/or directly from the patients. In a typical nursing facility in Illinois, however, roughly 68% of the patients are covered by Medicaid. Roughly 10% are covered by Medicare Part A. Roughly 22% are covered by Medicare Part D policies, other government funded programs, private insurers or direct paying patients.

89. Medicaid is a program funded jointly by the federal and state governments to provide health care benefits to certain people, primarily elderly, disabled, or low-income people. When a patient's pharmaceutical products or services are covered by Medicaid (again, the

majority of Illinois nursing facility patients are), Omnicare submits claims for reimbursement directly to the Illinois Medicaid program, which sets reimbursement levels for each drug prescribed.

90.    Medicare is a federally-funded health insurance program primarily benefiting the elderly.  The Department of Health and Human Services operates Medicare through its sub-agency, the Centers for Medicare and Medicaid Services ("CMS").

91.    Medicare Part A, the Basic Plan of Hospital Insurance, covers the costs of inpatient hospital services up to the first 100 days, and certain post-hospital care for skilled nursing or skilled therapy.

92.    When a patient is covered under Medicare Part A, the nursing facility receives fixed per diem payments for each patient directly from Medicare.  Omnicare then bills the nursing facility for the pharmaceutical medications and products provided to Medicare Part A patients, and the facility is supposed to remit a portion of its receipts as payment for the applicable prescription charges.

93.    Medicare Part D is a voluntary prescription drug benefit program for Medicare enrollees that became effective January 1, 2006.  42 U.S.C. § 1395w-101, *et seq*.  Medicare part D coverage is offered through private insurance companies known as Part D sponsors, which contract with CMS to administer prescription drug plans ("PDP's").  CMS provides each Part D sponsor advance monthly payments consisting of a direct subsidy per enrollee, estimated subsidies for catastrophic coverage, and estimated low-income subsidies.

94.    When a patient's prescription medications are covered under a Medicare Part D plan, Omnicare submits a claim directly to, and receives payment from, the plan sponsor.  The plan sponsor then notifies CMS of the event, including the cost the sponsor has incurred.  At the

end of each payment year, CMS reconciles the advance payments with the actual costs to the sponsor, according to applicable risk-sharing and reimbursement guidelines.

95.     Omnicare provides services to the State of Illinois on a contractual basis through its Medicaid provider licensure program.  In the program, Omnicare agreed to provide pharmaceuticals to Illinois Medicaid patients in the nursing facilities it serves, and the Illinois Department of Healthcare and Family Services the ("IDHFS")[1] agreed to reimburse Omnicare at a statutorily-defined rate, plus a fixed dispensing fee, meant to provide Omnicare with a profit.

96.     In order to be eligible to receive Medicaid reimbursements, Illinois pharmacies (including Omnicare's dispensing pharmacies) must complete an IDHFS application process and obtain a provider number.  Providers completing this application process must attest to their professional licensure, their Drug Enforcement Administration identification numbers, and must agree to the following provisions stated in the application, entitled "Agreement for Participation in the Illinois Medical Assistance Program":

> The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX of the Social Security Act, and also with all applicable Federal and State law and regulations.

This pledge is renewed each year.

97.     Illinois provides reimbursement for Medicaid providers via an electronic or paper-based claims process.  The Medicaid claim form Omnicare submits on a regular basis for reimbursement contains a mandatory certification that the provider has complied with all laws and regulations pertaining to Medicaid, including the Federal Anti-Kickback Statute.

98.     In Illinois, at least once per day, when each Omnicare facility batches its Medicaid claims and submits them electronically to IDHFS, as part of each electronic claim,

---

[1] Prior to 2005, the Illinois Department of Public Aid administered Medicaid in Illinois. In 2005, the IDHFS took over the administration of Medicaid in Illinois.

21

Omnicare affixes its unique Medicaid provider identification number, which serves as an electronic stamp indicating that, as an Illinois Medicaid provider subject to the Provider Agreement, Omnicare is in compliance and has complied with all applicable federal and state regulations. Claims are adjudicated instantaneously; Omnicare receives reimbursement on a weekly basis from IDHFS for all approved claims.

99. Upon information and belief, Omnicare has submitted and continues to submit thousands of such claims for pharmaceutical products dispensed to residents of nursing facilities in Illinois. These claims are the direct result of the contracts it obtains with the help of illegal kickbacks.

100. As stated above, all providers, including Omnicare, certify compliance with the Anti-Kickback Statute as a precondition to payment under all federal and state healthcare programs. In addition, Omnicare certifies its compliance with all relevant statutes and regulations, state and federal, upon application for a provider number and by using that provider number in submitting a claim. See 89 Ill. Admin. Code 140.12 ("The provider shall agree to comply with the requirements of Federal and State laws and not engage in practices prohibited by such laws.") It cannot obtain payments without these certifications. Omnicare's compliance with all relevant state and federal statutes and regulations, including the Anti-Kickback Statute, is a prerequisite to, and a condition of, payment by the Illinois Medicaid Program.

101. Omnicare therefore certifies compliance with the Anti-Kickback Statute and makes claims to the government seeking Medicaid reimbursement for pharmaceuticals on a daily basis.

102.   As a result of, and in reliance upon, these certified claims, the Illinois Medicaid programs paid for Omnicare's provision of pharmaceuticals to the patients at Illinois nursing facilities.

103.   The State of Illinois submits claims for payment to the United States for reimbursement of the federal share of Medicaid payments made to Omnicare and other providers.  For example, the Federal government pays the State of Illinois for a certain portion of the Medicaid program through quarterly grants.  Illinois submits a quarterly estimate to the United States in a form known as the Form CMS 37, which includes a certification that "budget estimates only include expenditures . . . that are allowable in accordance with the applicable implementing Federal, state, and local statutes, regulations, policies . . . ."  The United States uses the estimate in the CMS 37 to make a grant award for that quarter.  The award authorizes the state to draw Federal funds as needed through a line of credit.  At the end of each quarter, IDHFS submits its quarterly expenditure report, Form CMS 64, which details IDHFS's actual expenditures. The capitation payments to Omnicare and other providers are included in Form CMS 64, which includes the same certification as CMS 37.

104.   From January 2009 through the present, Omnicare has violated the Federal Anti-Kickback Statute and the Illinois Public Aid Code by its scheme of inducements as set forth above in Paragraphs 35 to 87, in order to secure business from nursing facilities, for which payment was provided by Medicaid.

### COUNT I
### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)

105.   Relator incorporates by reference and re-alleges paragraphs 1-104 as if fully set forth herein.

106.    This is an action for damages and civil penalties on behalf of the Government arising from false statements and records made or caused to be made by Omnicare to the government in violation of the FCA, 31 U.S.C. § 3729(a)(1).

107.    The FCA provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).

108.    The FCA also specifically authorizes any private person to bring a *qui tam* cause of action against any party who violates the FCA. 31 U.S.C. § 3730(b).

109.    From January 2009 through the present Omnicare has knowingly submitted false or fraudulent claims for payment or approval to the Illinois Medicaid program, which is funded with both state and Federal monies. Such claims were false and fraudulent and Omnicare knew such claims were false and fraudulent because Omnicare had violated the Federal Anti-Kickback Statute and the Illinois Public Aid Act but falsely represented and certified that it had complied with all applicable state and Federal laws, including the Federal Anti-Kickback Statute.

110.    The Federal Government pays a share of the medical assistance expenditures under Illinois' Medicaid program. That share, known as the Federal Medical Assistance Percentage ("FMAP") or the Federal Financial Participation ("FFP"), is determined annually by a formula that compares the State's average per capita income level with the national income average. States with a higher per capita income level are reimbursed a smaller share of their costs. By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.

111.    Payments made to Omnicare from Illinois' Medicaid program on Omnicare's false and fraudulent Medicaid claims resulted in the Federal Government paying a FFP which should not have been paid.

112.    Submission of false and/or fraudulent claims to State agencies that are reimbursed in whole or in part by Federal funds are deemed to be claims made to the United States government for purpose of the FCA.

113.    As a result, Defendant Omnicare has violated the FCA.

114.    Relator cannot at this time identify all of the false claims for payment that were made and caused by Omnicare's conduct. That information is solely within the possession of Omnicare.

**COUNT II**
**ILLINOIS FALSE CLAIMS ACT**
**740 ILCS § 175/1**

115.    Relator incorporates by reference and re-alleges Paragraphs 1-114 as if fully set forth herein.

116.    This action is brought by Relator pursuant to the submission of false claims to the State of Illinois in violation of the IFCA. 740 ILCS § 175/1, *et seq*.

117.    The IFCA provides that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000 . . . plus 3 times the amount of damages which the State sustains because of the act of that person." 740 ILCS 175/3(a)(1).

118.    The IFCA also specifically authorizes any private person to bring a *qui tam* cause of action against any party who violates the FCA.  740 ILCS 175/4.

119.    For the period of at least January 2009 through the present Omnicare has knowingly submitted false or fraudulent claims for payment or approval to the Illinois Medicaid program.  Such claims were false and fraudulent and Omnicare knew such claims were false and fraudulent because Omnicare had violated the Federal Anti-Kickback Statute and the Illinois Public Aid Act but falsely represented and certified that it had complied with all applicable state and Federal laws, including the Federal Anti-Kickback Statute.

120.    Payments made to Omnicare from Illinois' Medicaid program on Omnicare's false and fraudulent Medicaid claims resulted Illinois paying funds to Omnicare which should not have been paid.

121.    As a result, Defendant Omnicare has violated the IFCA.

122.    Relator cannot at this time identify all of the false claims for payment that were made and caused by Omnicare's conduct.  That information is solely within the possession of Omnicare.

### COUNT III
### ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT
### 740 ILCS § 92/1

123.    Relator incorporates by reference and re-alleges Paragraphs 1-122 as if fully set forth herein.

124.    This is an action brought by Relator brought by Relator for violations of the Illinois IFCPA.  740 ILCS § 92/1, *et seq*.

125.    Subsection 5(a) of the ICFPA provides that

it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or

26

benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

740 ILCS §92/5(a).

126.    Subsection 15(a) of the ICFPA provides for a *qui tam* action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. 740 ILCS § 92/15(a).

127.    For at least the time period of January 2009 through the present, Omnicare has violated Section 5(a) of the ICFPA by its scheme of inducements as set forth above in Paragraphs 34 to 88, in order to secure business from nursing facilities, for which payment was provided by private insurers.

128.    Each claim for reimbursement that Omnicare submitted to private insurers, including Medicare Part D plan sponsors, was a false and fraudulent claim for payment under the ICFPA.

129.    Private insurers unaware of the falsity of the claims made or caused to be made by Omnicare, paid and continue to pay the claims that would not be paid but for Omnicare's unlawful conduct.

130.    Relator cannot at this time identify all of the false claims for payment that were made and caused by Omnicare's conduct. That information is solely within the possession of Omnicare.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States and the State of Illinois, prays:

(a)     That this Court enter judgment against Defendant and find that Defendant has violated and is enjoined from future violations of the Federal False Claims Act, Illinois False Claims Act and the Illinois Insurance Claims Fraud Prevention Act;

(b)     That this Court enters judgment against Defendant in an amount equal to three times the amount of damages the Federal Government has sustained because of Defendant's false or fraudulent claims, plus a civil penalty of $5,500 to $11,000 for each and every violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States for its expenses related to this action;

(c)     That the Court find that because Defendant has operated, and is presently operating, under a Corporate Integrity Agreement during most of the period covered by the above allegations, the maximum civil penalty for each violation of 31 U.S.C. § 3729 is particularly warranted;

(d)     That Relator be awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d);

(e)     That this Court enters judgment against Defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant's false or fraudulent claims, plus a civil penalty of $5,500 to $11,000 for each and every violation of 740 ILCS § 175/3, and the costs of this action, with interest, including the costs to the State of Illinois for its expenses related to this action;

(f)     That the Court find that because Defendant has operated, and is presently operating, under a Corporate Integrity Agreement during most of the period covered by the above allegations, the maximum civil penalty for each violation of 740 ILCS § 175/3 is particularly warranted;

(g)     That Relator be awarded the maximum amounts allowed pursuant to 740 ILCS § 175/4;

(h)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant's false or fraudulent claims, plus a civil penalty of $5,500 to $11,000 for each and every violation of 740 ILCS § 92/5(a), and the costs of this action, with interest, including the costs to the State of Illinois for its expenses related to this action;

(i)     That the Court find that because Defendant has operated, and is presently operating, under a Corporate Integrity Agreement during most of the period covered by the above allegations, the maximum civil penalty for each violation of 740 ILCS § 92/5(a) is particularly warranted;

(j)     That Relator be awarded the maximum amounts allowed pursuant to 740 ILCS § 92/25;

(k)     That the United States, the State of Illinois and the Relator receive all other relief both in law and in equity that this Court deems just.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury.

Dated:  December 19, 2011

Respectfully submitted,

Robert H. Smeltzer
Kevin J. Clancy
LOWIS & GELLEN, LLP
200 WEST ADAMS STREET
SUITE 1900
CHICAGO, IL  60606
Phone:  (312) 364-2500
Fax:     (312) 364-1003
E-mail:  rsmeltzer@lowis-gellen.com
          kclancy@lowis-gellen.com

*Attorneys for Relator Alan J. Litwiller*