## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF ILLINOIS, <u>ex</u> <u>rel.</u> ALAN J. LITWILLER, | |
| Plaintiff, | Civil Action No: 1:11-cv-08980 |
| v. | Hon. Robert M. Dow, Jr. |
| OMNICARE, INC., Defendant. | |

## RESPONSE TO DEFENDANT'S
## <u>MOTION TO DISMISS RELATOR'S COMPLAINT</u>

**TABLE OF CONTENTS**

I.    **Background Facts** ......................................................................................................1

         Forgiveness of Accounts Receivable - ("A/R Conduct") .......................................3

         Improper Discounts for Pharmaceutical Services - ("Discounts Conduct")............3

         Improper Refunds and "Credits" - ("Refunds/Credits Conduct") .........................3

         Discounts and Subsidies for Third Party Services - ("SigmaCare Conduct")........4

         Free Consulting Services and Other Services - ("Free Services Conduct") ...........4

         Omnicare Foundation - ("Omnicare Foundation Conduct") ...................................5

II.    **Summary Of The Argument** ..................................................................................5

III.    **The A/R Conduct Claim Is Not Barred By *Ruscher* Under The First-To-File Rule Because The Material Facts Here Differ Substantively In Nature And Scope** ...........7

    A.    *Ruscher* Involves Collections From A Materially Different Group Of Nursing Facilities ........................................................................................8

    B.    The Scheme In *Ruscher* Did Not Allege Any Conduct Related To Or Overlapping With The Scheme In Illinois.........................................................9

    C.    The Scheme In The Present Case Involves Forgiveness Of Debts For Products and Services That Are Not At Issue In *Ruscher* ....................................10

    D.    *Ruscher* Cannot Trigger The First-To-File Bar Because Omnicare Concedes The Allegations In That Case Are Insufficient ....................................11

IV.    **The Discounts Conduct Is Not Barred Because The Subpoena For Documents Does Not Constitute A Public Disclosure And Relator Is An Original Source** ..........12

V.    **Relator's Complaint Satisfies The Pleading Requirements Of Rule 12(b)(6)**.................................................................................................16

    A.    Relator Adequately Pleads Knowing Violations ...................................................17

    B.    The Allegations, Reasonable Inferences And Further Consistent Facts Are Sufficient To Demonstrate Omnicare Offered Products And Services At Below Fair Market Value Which Constitutes Unlawful Remuneration ..........17

         1.    A/R Conduct ..............................................................................................18

         2.    Discounts Conduct.....................................................................................20

         3.    Refunds/Credits Conduct ..........................................................................20

         4.    SigmaCare Conduct ..................................................................................21

         5.    Free Services Conduct ...............................................................................22

i

6.     Omnicare Foundation Conduct ................................................................22

**VI.**    **Relator's Complaint Satisfies the Pleading Requirements Of Rule 9(b)** .........................................................................................................23

A.     Specific Allegations of Submission of False Claims ................................23

B.     Specific Allegations As To The Schemes..................................................26

**VII.**    **Conclusion** ..........................................................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Campbell v. Redding Med. Ctr.*,
421 F.3d 817 (9th Cir. 2005) ............................................................ 11

*Glaser v. Wound Care Consultants, Inc.*,
570 F.3d 907 (7th Cir. 2009) ........................................................ 12-14

*Highsmith v. Chrysler Credit Corp.*,
18 F.3d 434 (7th Cir. 1994) ............................................................ 16

*Reynolds v. CB Sports Bar, Inc.*,
623 F.3d 1143 (7th Cir. 2010) ........................................................ 16

*U.S. ex rel. Batiste v. SLM Corp.*,
740 F. Supp. 2d 98 (D.D.C. 2010) ...................................................... 11

*U.S. ex rel. Batty v. Amerigroup Illinois, Inc.*,
528 F.Supp.2d 861 (N.D. Ill. 2007) ................................................. 8, 15

*U.S. ex rel. Bledsoe v. Community Health Sys.*,
342 F.3d 634 (6th Cir. 2003) ............................................................ 11

*U.S. ex rel. Chovanec v. Apria Healthcare Grp., Inc.*,
606 F.3d 361 (7th Cir. 2010) ................................................7, 9-10, 28-29

*U.S. ex rel. Foster v. Bristol-Myers Squibb Co.*,
587 F. Supp. 2d 805 (E.D. Tex. 2008) ................................................ 21

*U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*,
324 F.3d 492 (7th Cir. 2003) ........................................................ 12-13

*U.S. ex rel. Fowler v. Caremark RX, L.L.C.*,
496 F.3d 730 (7th Cir. 2007) ............................................................ 14

*U.S. ex rel. Geschrey v. Generations Healthcare, LLC*,
922 F. Supp. 2d 695 (N.D. Ill. 2012). ............................................. 23, 26

*U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
929 F.Supp.2d 807 (N.D. Ill. 2013) .................................................... 26

*U.S. ex rel. Grynberg v. Koch Gateway Pipeline Co.*,
390 F.3d 1276 (10th Cir. 2004) ........................................................ 15

iii

*U.S. ex rel. Howard v. Urban Inv. Trust, Inc.*,
  2009 WL 2252252 (N.D. Ill. Jul. 29, 2009) ............................................................ 16


*U.S. ex rel. Klaczak v. Consolidated Med. Transp.*,
  458 F. Supp. 2d 622 (N.D. Ill. 2006) ................................................................ 17-18

*U.S. ex rel. McLain v. Fluor Enterprises, Inc.*,
  2013 WL 4721365 (E.D. La. Sept. 3, 2013) .......................................................... 10

*U.S. ex rel. Merena v. SmithKline Beecham* Corp.,
  205 F.3d 97 (3rd Cir. 2000) ................................................................................. 7-8

*U.S. ex rel. Munoz v. Computer Sys. Inst., Inc.*,
  2013 WL 5781810 (N.D. Ill. Oct. 25, 2013) ...................................................... 16-17

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
  906 F. Supp. 2d 1264 (N.D. Ga. 2012) ................................................................. 14

*U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*,
  2013 WL 1749861 (M.D. Fla. Jan. 8, 2013) .......................................................... 14

*U.S. ex rel. Soulias v. Northwestern Univ.*,
  2013 WL 3275839 (N.D. Ill. June 27, 2013) ......................................................... 25

*U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc.*,
  2002 WL 34543515 (N.D. Ill. Dec. 5, 2002) ............................................. 25, 26, 27

*U.S. ex rel. Walburn v. Lockheed Martin Corp.*,
  431 F.3d 966 (6th Cir. 2005) ..................................................................... 11, 15

## STATUTES

31 U.S.C. § 3729, *et seq.* ........................................................................................... 1

31 U.S.C. § 3730(b)(5) ............................................................................................... 7

42 U.S.C. § 1320a-7b(b) ........................................................................................... 16

740 ILCS § 175/1, *et seq.* ........................................................................................... 1

740 ILCS § 92/1 .......................................................................................................... 1

740 ILCS 175/4(b)(5) .................................................................................................. 7

iv

## RULES

Fed. R. Civ. P 12(b)(6).................................................................................................. 6, 16-17

Fed. R. Civ. P 9(b) ................................................................................ 7, 11, 23, 25, 26

## OTHER AUTHORITIES

*U.S. ex rel. Maguire v. Omnicare, Inc.*,
   First Am. Compl., No. 02-cv-11436 (D. Mass. Filed June 21, 2005) ................................ 14-16

*U.S. ex rel. Maguire v. Omnicare, Inc.*,
   Order of Dismissal, No. 02-cv-11436 (D. Mass. Filed Nov. 3, 2009)................................ 14-16

*U.S. ex rel. Ruscher v. Omnicare*,
   Pl. Sec. Am. Compl., No. 4:08-cv-03396, (S.D. Tex. Filed Sep. 11, 2009)..............6-12, 28-29

Relator, Alan J. Litwiller, by his undersigned attorneys, submits the following response to Defendant Omnicare, Inc.'s Motion to Dismiss Relator's Complaint. Omnicare's Motion is an example of a now commonplace strategy of *qui tam* defendants, particularly Omnicare, to demand dismissal if a Relator does not yet have all the evidence needed to present a closing argument to a jury. The Motion distorts pleading standards, seeks to hold Relator to an impossibly high burden, and recasts the nature of allegations in other cases to suggest the allegations here are duplicative. None of these arguments justify dismissal of the Complaint.

## I.    Background Facts

Relator brings this action for damages and civil penalties on behalf of the United States of America and the State of Illinois, arising from: (a) false statements and records made or caused to be made by Omnicare to the United States or its agents or intermediaries in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*.; and (b) false statements and records made or caused to be made by Omnicare to the State of Illinois or its agents or intermediaries in violation of the Illinois False Claims Act ("IFCA"), 740 ILCS § 175/1, *et seq*.; and (c) violations of the Illinois Insurance Claims Fraud Prevention Act ("ICFPA"), 740 ILCS § 92/1, *et seq*. Omnicare is an institutional pharmacy and one of the nation's largest providers of pharmaceutical products and services to nursing facilities, long-term care facilities, assisted living communities, and other chronic care settings ("the facilities"). (Compl. ¶ 3).

Payments for Ominicare's pharmaceutical products and services comes in large part through Medicare and Medicaid. (Compl. ¶ 4, 88). During the period of at least January 2009 through the present, Omnicare engaged in a series of schemes to offer and pay illegal inducements (including credits, rebates, payments, free services and discounted products and services) to induce facilities to purchase or continue purchasing products and services

1

reimbursed through Medicare and Medicaid.  In so doing, Omnicare violated Federal and State Anti-Kickback Statutes ("AKS").  (Compl. ¶ 5).

In seeking reimbursement from Medicaid, Omnicare was required to and did certify that it complied with all AKS, on each claim submitted.  Each such certification was false, and therefore each claim submitted to Medicaid was false, because Omnicare in fact was in violation of the AKS at the time of each relevant claim.  As a result, Omnicare received millions of dollars in payments from federal and state funds to which it was not entitled.  (Compl. ¶ 6).

Omnicare's largest, most profitable business is providing prescription medications. However, Omnicare also provides a wide array of pharmaceutical and other services.   For example, Omnicare's Consulting Pharmacists provide facilities with direction and oversight on all aspects of the acquisition, disposition, handling, storage and administration of prescription medications and devices in the facilities.  Consulting Pharmacists also review medical charts and provide comments and input to nurses or prescribing physicians.  (Compl. 25-29).

Omnicare also provides Consulting Nurses who perform a value added services including: reviewing, cleaning and organizing medication carts; ensuring that all medications needed are ordered and present prior to distribution; and participating in administering medications to patients.  Omnicare provides services including: drug therapy management; unit-of-use medication delivery systems; customer service professionals for rapid response and emergency service; customized quality assurance, developed by teams of regulatory experts; and compliance assistance with state and federal regulations.  Finally, Omnicare provides facilities with over-the-counter ("OTC") medications and other non-prescription products they are required to maintain, but that are not reimbursed by Medicare.  Omnicare charges its nursing facility clients directly for these medications and products.  (Compl. ¶ 30-32).

In order to secure a continuing and lucrative stream of prescription medication business, Omnicare has developed and implemented the following inducement schemes.

### *Forgiveness of Accounts Receivable* - **("A/R Conduct")**

Although Omnicare bills facilities on a monthly basis, as early as January of 2009 Omnicare, at the direction of its Regional Vice President of Pharmacy Services for the Illinois Region, A. Samuel Enloe ("Enloe"), engaged in a pattern and practice of agreeing to forego payment of those bills for many of its clients, in exchange for and as an inducement for the facilities to continue purchasing purchase lucrative prescription medications from Omnicare. As a result, Omnicare permitted many nursing facilities with which it does business in Illinois to amass substantial accounts receivables, often comprised in large part or entirely of charges for pharmaceutical services and non-prescription products. (Compl. ¶ 36-48).

### *Improper Discounts for Pharmaceutical Services* - **("Discounts Conduct")**

In October 2009, pursuant to a Consent Decree with the U.S. Department of Justice, Omnicare entered into an Amended and Restated Corporate Integrity Agreement ("CIA") with the Department of Justice. The CIA set forth a variety of required compliance measures and best practices. Pursuant to this, a policy was implemented whereby Omnicare would charge a fee for pharmaceutical services that reflected the real value of those services. Rather than implement this policy with regard to favored clients in Illinois, Enloe agreed to provide improper discounts for those services, as an inducement to keep key customers. (Compl. ¶ 49-58).

### *Improper Refunds and "Credits"* – **("Refunds/Credits Conduct")**

In a number of instances, Omnicare learned that certain facilities were threatening to terminate their relationships, or were being solicited by competitors. In response, Omnicare contacted those clients and claimed it had conducted a review of its prior billing records,

determined it had overcharged the clients by various amounts (in some cases ranging from $60,000 to $300,000) and offered the clients a "credit" of those amounts. There was in fact no legitimate accounting basis for these "credits." Rather they were trumped up, based on fear of losing customers, and offered as inducement to prevent an expected loss of business. (Compl. ¶ 59-74).

### Discounts and Subsidies for Third Party Services – ("SigmaCare Conduct")

In or around March 2009, Omnicare entered into a financial arrangement with SigmaCare, an electronic medical records management company, in which Omnicare would sell SigmaCare services and programs to facilities. For at least the period of October 2009 through December 2011, Omnicare promoted and sold SigmaCare products and services to facilities throughout Illinois, on numerous occasions offering SigmaCare at a substantial discount from regular prices to any facility that agreed enter into a fixed, multi-year agreement with Omnicare for the provision of medications and services. This resulted in Omnicare either receiving a lower commission from SigmaCare, or Omnicare directly paying some of the cost for the SigmaCare services and programs. Omnicare offered these discounts and payments to the facilities to enter into long-term agreements for the provision of pharmaceutical products and services. Omnicare made the determination that the direct or indirect costs of the discounts and/or payments were an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois. (Compl. ¶ 75-78).

### Free Consulting Services and Other Services – ("Free Services Conduct")

In November 2010, Omnicare instituted a policy to charge $65 per hour for pharmacy and other consulting services that it provided to nursing facilities. Enloe complained to officers at Omnicare's corporate headquarters that this policy placed him at a competitive disadvantage

in the Illinois region. Enloe then persuaded those officers to change the policy so that Omnicare would only charge this fee for services that were mandated by regulation. Any and all other consulting and advisory services that Omnicare provided to nursing facilities would be provided for free. Omnicare provided these services to clients for free to induce them to continue their business relationships with Omnicare and continuing to directly or indirectly purchase prescription medications from Omnicare. In doing so, Omnicare made the determination that the additional costs incurred are an acceptable sacrifice to ensure a continuing and extremely lucrative stream of prescription drug business in Illinois. (Compl. ¶ 79-83).

### *Omnicare Foundation* – ("Omnicare Foundation Conduct")

For over twelve years, Omnicare operated the Omnicare Foundation, which was ostensibly formed as a charitable organization. In Illinois, the Foundation was administered by Vernon Gideon, a registered pharmacist for Omnicare of Northern Illinois. Gideon operated under the direction and instructions of Enloe. Various clients of Omnicare asked Enloe to have the Foundation make payments on the clients' behalf to various organizations or entities. Enloe mischaracterized these payments as charitable contributions, when in many instances they were actually indirect payments to the owners of the nursing facilities. (Compl. ¶ 84-87).

## II.    Summary Of The Argument

Based on the foregoing, Relator alleges Omnicare engaged in unlawful inducements to facilities, to secure business that was reimbursable from the state and federal governments, all in violation of the AKS. Because it submitted claims for payment to government sources on a near daily basis, each time falsely certifying that it was in compliance with the AKS, each of those claims constituted a false claim under the FCA and related state statutes.

Omnicare has moved to dismiss the Complaint. Omnicare argues the claim based on A/R Conduct is barred by the first-to-file rule, because a case filed in Texas before the present case also made allegations related to forgiveness of certain accounts receivable. Actually, the allegations as to the A/R Conduct here are not barred because they are materially different in critical respects from those in the Texas case, and Relator places the government on notice of new and importantly distinct types of fraud, which the Texas case failed to do.

Next, Omnicare argues that the claim based on Discounts Conduct is barred under the public disclosure rule, because Omnicare received a subpoena before this case was filed, asking for documents relating to the pricing of pharmaceutical services, and because a long terminated case in another state addressed issues relating to discounts for pharmaceutical services. The allegations of the Discounts Conduct are not barred because the subpoena did not disclose or substantiate that the government was aware of any fraudulent scheme, there is no indication that Omnicare produced any documents in response to that subpoena that showed a fraudulent scheme; therefore, the subpoena was insufficient to qualify as a public disclosure. Moreover, the prior case was terminated years before this action was filed, and therefore presents no bar. Finally, the public disclosure bar could not apply in any event because Relator is an original source of the allegations in this case.

Omnicare next argues the Complaint falls short under Rule 12(b)(6) because it fails to allege knowledge by Omnicare, and fails to allege that any products or services were offered at below fair market value. In this regard, Relator has adequately alleged that Omnicare acted knowingly because it carefully evaluated its business and its risk of losing business, developed schemes designed to induce continued business and knowingly made the determination that sacrificing certain payments in inducement was worth the cost in order to secure a much larger

6

stream of income from the highly profitable prescription medication business. (Compl. ¶ 48, 58, 74, 78, 83 and 87). Relator also alleges the inducements were unlawful because the facts and reasonable inferences demonstrate all of the products and services offered were below fair market value.

Finally, Omnicare argues that the Complaint fails to comply with Rule 9(b). This argument fails because Relator has adequately pled sufficient detail as to the fraudulent schemes, the ways in which they were carried out, the ways in which those schemes violated the AKS, and the ways in which those violations resulted in submission of false claims.

## III. The A/R Conduct Claim Is Not Barred By *Ruscher* Under The First-To-File Rule Because The Material Facts Here Differ Substantively In Nature And Scope.

Omnicare argues this Court lacks subject jurisdiction over the allegations related to the A/R Conduct under 31 U.S.C. § 3730(b)(5), and 740 ILCS 175/4(b)(5), the "first-to-file" bar. These statutes provide that prior pending actions will bar later filed "related" actions "based on the facts underlying the [already] pending action." The rationale for *qui tam* suits in general is to provide an incentive to private litigants to assist the government in uncovering fraudulent activity. *U.S. ex rel. Chovanec v. Apria Healthcare Grp., Inc.*, 606 F.3d 361, 364 (7th Cir. 2010). The rationale underlying the first-to-file bar, in turn, is that there is no need to provide that incentive in a later case when the government was already alerted to the alleged fraud from allegations in an earlier case. *Id.*

Omnicare contends the allegations here are subsumed in the earlier filed case of *U.S. ex rel. Ruscher v. Omnicare*, No. 4:08-cv-03396. However, the Seventh Circuit explained that only those later filed actions based on the same "material facts" or the same "essential facts" from the earlier action are barred. *Chovanec*, 600 F.3d at 363. Therefore, to determine whether this bar applies, the Court must conduct a "claim by claim analysis," *U.S. ex rel. Merena v. SmithKline*

*Beecham* Corp., 205 F.3d 97, 102 (3rd Cir. 2000), and "compare the facts underlying the two cases." *U.S. ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F. Supp. 2d 861, 873 (N.D. Ill. 2007). Here, that analysis demonstrates the A/R Conduct is not based on the same material or essential facts in *Ruscher*. Rather, the core factual allegations in the two cases are materially different and in certain instances mutually exclusive.

### A. *Ruscher* Involves Collections From A Materially Different Group Of Nursing Facilities.

The relator in *Ruscher* alleged that during the time period at issue in that case, there were three types of accounts at Omnicare. The first category is "National Accounts," those with "multiple locations in multiple states." (Def. Exh. B, ¶ 591). There were forty such National Accounts as explained in *Ruscher*. *Id.* Debts on these National Accounts were allegedly managed by senior executive management at the national headquarters. *Id.* The second category is "Pharmacy Hold Accounts" or "P-Hold Accounts," which had collection holds placed on them by corporate management, and those holds were usually permanent. (Def. Exh. B, ¶ 592). The third category is all other accounts, which the relator in *Ruscher* mistakenly believed were subject to rigorous collection efforts. (Def. Exh. B, ¶ 594). In *Ruscher*, the material or essential facts are that Omnicare was forgoing collection of accounts receivable mainly for National Accounts and sometimes also for P-Hold Accounts.

By contrast, Relator in the present case has discovered that Omnicare management in Illinois was engaging in its own scheme to forgo collection of accounts from facilities in Illinois, or in a small number of limited instances in adjacent states, that did not fall into either of those categories. Attached to this brief as Exhibit A is a list of the facilities referred to in the Complaint. (Rel Exh. 1). The facilities at issue in the A/R Conduct were Clients A-E (Petersen Health Care, Platinum Health Care, Extended Care Clinical, LLC, Asta Care Centers of Illinois,

and Meadowbrook Manor Nursing and Rehabilitation). (Compl. ¶ 36-48; Rel Exh. 1). None of those facilities were National Accounts or P-Hold Accounts, and none of them are mentioned or implicated in *Ruscher*. The allegations regarding this conduct thus do not in any way overlap with the allegations in *Ruscher*. Rather, the allegations here involve a localized scheme in Illinois, which *Ruscher* does nothing to reveal or disclose to the government. Not only does *Ruscher* fail to alert the government to alleged fraud relating to the type of accounts at issue in the present case, it actually throws the government off the track by alleging that such accounts were "subject to vigorous collection efforts." (Def. Exh. B, ¶ 594). In fact, in the case of this localized scheme, driven by Enloe, that was not the case at all.

**B.    The Scheme In *Ruscher* Did Not Allege Any Conduct Related To Or Overlapping With The Scheme In Illinois.**

Next, *Ruscher* alleges the scheme at issue there was developed and implemented primarily at a national level, from senior executive management in the company headquarters. (*See e.g*., Def. Exh B, ¶ 591, 605). The only regional office *Ruscher* refers to is an office in New York. (Def. Exh. B, ¶ 611). There is no mention of any A/R Conduct in Illinois, let alone the specific scheme developed and implemented here by Enloe. The Seventh Circuit has specifically explained that there is a material difference in facts between a scheme orchestrated at a national level, and one instituted by an individual in a particular regional office. *Chovanec*, 600 F.3d at 364 ("[T]o understand whether the suits materially overlap we must know whether the initial suits alleged frauds by rogue personnel at scattered offices or instead alleged a scheme orchestrated by [the company's ] national management."). Nothing about the allegations in *Ruscher* could reasonably have put the government on notice of the scheme developed and orchestrated by Enloe in Illinois, because there is no mention or reference to the Illinois scheme in the *Ruscher* complaint.

9

**C.     The Scheme In The Present Case Involves Forgiveness Of Debts For Products And Services That Are Not At Issue In *Ruscher*.**

The allegations in *Ruscher* are that, under Omnicare's scheme, the company refrained from collecting amounts owed by the facilities for Medicare Part A reimbursement.  (Def. Exh. B, ¶ 575, 585-86, 595).  In the present case, however, Relator also alleges that Omnicare's forgiveness of accounts receivable included charges for "Pharmaceutical Services," and over-the-counter medications, which was not alleged in *Ruscher*.  (Compl. ¶ 33-34 and 37).  As such, *Ruscher* could not have placed the government on notice of those allegations.

Because there are distinct and material facts in the present case that are not part of the *Ruscher* case, the two cases cannot be deemed "related" for purposes of the first-to-file bar.  *U.S. ex rel. McLain v. Fluor Enterprises, Inc.*, 2013 WL 4721365, * 7 (E.D. La. Sept. 3, 2013) (a subsequent case alleging only "more details regarding the exact same fraudulent conduct" will be barred, but if it alleges "conduct distinct from the [earlier case]" it is not barred, even if there are some overlapping allegations).  The purpose behind to the first-to-file bar is to preclude "me too" suits that "do no more than remind the United States of what it has learned from the initial suit," "without revealing anything new."  *Chovanec*, 600 F.3d at 364.  The Relator here identified and disclosed a particular scheme to defraud, that was developed and initially implemented by a regional actor, Enloe, with regard to a specific set of facilities in the Illinois area, related to forgiveness of accounts receivable including charges for Pharmaceutical Services and OTC medications.  *Ruscher* does not discuss or disclose any part of this scheme.

As a result, the present case is not simply a tag-along case that presents mere variations of the earlier allegations.  Rather, it presents new and different allegations of a scheme that was previously unknown and undisclosed to the government.  Therefore, this Court has jurisdiction over the allegations related to the A/R Conduct.

### D. *Ruscher* Cannot Trigger The First-To-File Bar Because Omnicare Concedes The Allegations In That Case Are Insufficient.

Courts routinely hold that if the allegations in an earlier filed suit are deficient under federal pleading standards, they cannot trigger the first-to-file rule. The reasoning is that deficient allegations are insufficient to provide adequate notice of the fraud. *See U.S. ex rel. Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 973 (6th Cir. 2006) ("complaint that is insufficient under Rule 9(b) is dismissed precisely because it fails to provide adequate notice to the defendant of the fraud it alleges"). *Id.*; *see also Campbell v. Redding Med. Ctr.*, 421 F.3d 817 (9th Cir. 2005) (complaint over which federal court lacks subject matter jurisdiction is no bar to subsequent complaint); *U.S. ex rel. Bledsoe v. Community Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003). As the Sixth Circuit explained, a "complaint that fails to provide adequate notice to a defendant can hardly be said to have given the government notice of the essential facts of a fraudulent scheme, and therefore would not enable the government to uncover related frauds." *Walburn*, 431 F.3d at 973.

Notably, Omnicare moved to dismiss in *Ruscher*, in part because it fails to adequately plead a claim for fraud under Rule 9(b). (See Rel Exh. 2) (*Ruscher*, Dkt. No, 120). Although the court there has not dismissed that case, as occurred in *Walburn* for example, Omnicare's motion presents a clear concession that the allegations in *Ruscher* are insufficient to place it on notice of the alleged fraud. If the allegations in *Ruscher* are not sufficient to apprise Omnicare of the nature of the fraud, they cannot adequately provide notice to the government either.[1] At a

---

[1] Relator acknowledges one other court held a failure to comply with 9(b) does not necessarily preclude a prior case from triggering the first-to-file bar because 9(b) serves many purposes, not just providing adequate notice. *U.S. ex rel. Batiste v. SLM Corp.*, 740 F. Supp. 2d 98, 104 (D.D.C. 2010) *aff'd*, 659 F.3d 1204 (D.C. Cir. 2011). However, Omnicare clearly seeks dismissal in *Ruscher* because the complaint makes only "conclusory and generalized allegations." (*Ruscher*, Dkt. No. 120, p. 24). Therefore, Omnicare is invoking Rule 9(b) to attack the lack of adequate notice, not for any other ancillary purpose under the Rule. Omnicare is conceding the allegations in *Ruscher* are insufficiently pled; therefore, they cannot have provided adequate notice of the fraud.

minimum, it would be premature to dismiss the present case based on *Ruscher*, when that case may be dismissed for failure to adequately plead.

**IV.    The Discounts Conduct Is Not Barred Because The Subpoena For Documents Does Not Constitute A Public Disclosure And Relator Is An Original Source.**

Omnicare's next jurisdictional argument concerns Relator's allegations that Omnicare provided improper discounts for pharmaceutical services to various facilities ("Discounts Conduct"). Omnicare argues there was a "public disclosure" of this fraudulent scheme evidenced by a Department of Justice subpoena issued to Omnicare on March 1, 2011, seeking a broad away of documents on a number of subjects, including in part, documents relating to pricing for pharmaceutical services. (See Def. Exh. D). In other words, from a single subpoena seeking documents, Omnicare leaps to the conclusion that: 1) there was a fraudulent scheme, 2) the government was aware of the fraudulent scheme, and 3) there was a "public disclosure" of that scheme that bars Relator's allegations. As a result, Omnicare contends these allegations are barred under 31 U.S.C. § 3730(e)(4), the public disclosure bar.

Omnicare cites to only one case as authority for its proposition that the mere issuance of a subpoena by the government demonstrates public disclosure: *Glaser v. Wound Care Consultants, Inc.* 570 F.3d 907, 913-914 (7th Cir. 2009). Omnicare significantly overstates the very limited and fact-specific holding in *Glaser*. In that case, the government had not merely sent a request for documents. Rather, the Center for Medicare and Medicaid Services ("CMS") actually sent a letter revealing it was investigating fraudulent billing practices and "demanding repayment for Wound Care's improper use of [a doctor's] billing code." *Glaser*, 570 F.3d at 913. The *Glaser* court explained that the public disclosure requirement is satisfied when the agency charged with enforcement has "'issued [documents] containing information that substantiates an allegation of fraud.'" *Glaser*, 570 F.3d at 914 (quoting *U.S. ex rel. Feingold v.*

*AdminaStar Fed., Inc.*, 324 F.3d 492, 496 (7th Cir. 2003)) (emphasis added). In *Glaser*, the government actually commenced a fraud investigation "designed to recover money Wound Care should not have received." *Glaser*, 570 F.3d at 914. The fact that CMS was actually seeking repayment of funds obtained by the fraudulent scheme "substantiated" the allegation of fraud, by demonstrating there was already a basis to believe the fraud had occurred. *Id.*

In the present case, by contrast, the subpoena does not even suggest the government was actually demanding the repayment of any funds unlawfully obtained, let alone substantiate an allegation of a fraudulent scheme. It was merely a request for documents, nothing more. It therefore differs in substance and effect from the demand for repayment in *Glaser*.

Moreover, Omnicare does not allege it actually complied with the Subpoena or produced any documents, let alone documents that would have alerted the government to the fraudulent scheme alleged by Relator. Instead, Omnicare makes the remarkably self-serving claim that Relator does not "allege any information that would not have been included in Omnicare's response to the subpoena." (Def. Mot., p. 13). In this regard, Omnicare has it backwards. Relator need not demonstrate his allegations contain information not distinct from what Omnicare may or may not have produced in to the subpoena (if there was any). Rather, Omnicare, as the only party that knows what, if any, documents were produced, must support its argument by demonstrating that its response disclosed the same scheme alleged here. It is holding those documents behind its back, and faulting Relator for not demonstrating how his allegations differ from information in those (possibly non-existent) documents.

Several courts have held that a mere subpoena for documents does not suffice as a public disclosure; rather, a defendant must demonstrate documents were actually produced in response, and that those documents disclose the same information alleged in the *qui tam* case, or that the

subpoena itself contained allegations of fraud. *See e.g.*, *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 736 (7th Cir. 2007) (*overruled on other grounds*, *Glaser*, 570 F.3d 907) (allegations barred by public disclosure because Omnicare had produced over 11,000 pages of documents to the government relating to the allegations constituted a public disclosure); *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1274 (N.D. Ga. 2012) (subpoena did not constitute public disclosure because it contained no allegations of fraud); and *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, 2013 WL 1749861, *3 (M.D. Fla. Jan. 8, 2013) (finding a public disclosure only because there had been production of documents pursuant to the subpoena, and those documents contained much of the information alleged in the fraudulent scheme). Because there is no indication in the subpoena that the government was already aware of a fraudulent scheme, or that documents produced in response to the subpoena disclose the fraudulent scheme alleged here, the subpoena itself is not sufficient to constitute a public disclosure and bar the claim here.

Omnicare also argues the Discounts Conduct claim should be barred because it is similar to the allegations in the case of *U.S. ex rel. Maguire v. Omnicare, Inc.*, No. 02-cv-11436 (D. Mass.) Omnicare cites no authority for this proposition. Rather, this seems to be an attempt to bootstrap the first-to-file bar (pending case with the same allegations) into the confines of the public disclosure bar. The fatal flaw there is that *Maguire* had been settled and terminated over two years before the present case was filed. (Rel Exh. 3) (*Maguire*, Dkt. No. 49).

A suit that has already been dismissed or settled, and is therefore no longer pending when a subsequent suit is filed, does not bar the later suit. "In essence, the first to file bar precludes claims arising from events that are already the subject of an <u>existing</u> qui tam suit." *U.S. ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F.Supp.2d 861, 872 (N.D. Ill. 2007) (emphasis added).

The first-to-file bar "prohibits private relators from bringing a related action based on the facts underlying a <u>pending</u> qui tam case." *U.S. ex rel. Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1277 (10th Cir. 2004) (emphasis added). "[T]he ultimate fate of an earlier-filed action does not determine whether it bars a later action under § 3730(b)(5); rather the question is only whether the earlier action was '<u>pending</u>' at the time the later action was filed." *U.S. ex rel. Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005) (emphasis added). The *Maguire* suit was long over when this action was filed. Relator alleges that a scheme to defraud was occurring in Illinois long after *Maguire* was settled, and long after this type of conduct had supposedly been corrected, which is information that had never been publicly disclosed. Relator's allegations serve the valuable purpose of alerting the government to the fact that a kind of fraudulent scheme that was supposed to have been cured, was actually being reborn in a new region, by new players. In sum, neither the subpoena for documents nor the previously terminated *Maguire* suit constitutes a public disclosure that could in any way bar Relator from pursuing this action.

Even if there had been a public disclosure, Relator still could pursue this action because he is an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A)(iii). An original source is one who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C.A. § 3730(e)(4)(B). Relator voluntarily provided the information in the Complaint to both the U.S. Attorney and the Illinois Attorney General prior to filing this action. That is not set forth in the Complaint because it was a confidential communication between Relator and those government officials at the time.

In addition, Relator has independent knowledge because he learned of the information independently of the *Maguire* case or the subpoena (even if those were public disclosures). *U.S. ex rel. Howard v. Urban Inv. Trust, Inc.*, 2009 WL 2252252, *4 (N.D. Ill. Jul. 29, 2009). He was directly involved in interfacing with the facilities at issue, and working with their personnel closely on a regular basis. He knew exactly what services were being provided to those facilities, because he was responsible for ensuring that the services were adequate to meet the needs of the facilities. He had direct knowledge of what was being charged to the facilities. In addition, he had over 30 years of experience in the field in both private industry and regulatory capacities and knew what constituted fair value for services of that nature, and therefore knew independently that the facilities were being charged far below a fair value.[2]

## V.     Relator's Complaint Satisfies The Pleading Requirements Of Rule 12(b)(6).

Omnicare's next line of attack is that Relator fails to plead violations of the AKS sufficiently under Rule 12(b)(6). The elements at issue are that Omnicare (1) knowingly and willfully (2) paid or offered to pay (3) remuneration (4) to induce another party to purchase or order any item or service for which payment can be made under a federal health program. 42 U.S.C. § 1320a-7b(b). When evaluating a motion to dismiss under Rule 12(b)(6), the Court not only "takes as true all factual allegations in Plaintiff's complaint," but also "draws all reasonable inferences in its favor." *U.S. ex rel. Munoz v. Computer Sys. Inst., Inc.*, 2013 WL 5781810, *3 (N.D. Ill. Oct. 25, 2013).

---

[2] Even though these particular facts may not be in the Complaint, Relator is permitted to raise them now to show that the Complaint should not be dismissed because they are consistent with the allegations. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439-40 (7th Cir. 1994) (plaintiffs may defend 12(b)(6) motions with additional facts outside of the complaint as long as those facts are consistent with the underlying allegations). Relator alleged that he has "direct, personal, and independent knowledge of the facts underlying the allegations of this Complaint," that he is the original source of information, and that he has knowledge of the false claims. (Compl. ¶ 13-15). These additional facts are consistent with those existing allegations and therefore permissible in defending this Motion.

## A.    Relator Adequately Pleads Knowing Violations.

Initially, Omnicare refers to the obligation to plead that the violations at issue were done knowingly.  Omnicare never definitively claims that the allegations were insufficient on this issue, but simply repeats the requirement and cites to numerous cases setting forth the core elements of a claim.  To the extent Omnicare is alleging that Relator inadequately pled knowledge, the argument must fail.  When pleading a complaint under the FCA based on violations of the AKS, it is sufficient to plead knowledge generally.  *Munoz*, 2013 WL 5781810 at * 4.  Here, Relator has pled ample facts demonstrating that Omnicare knowingly set upon a course to develop and implement several fraudulent schemes for the purpose of inducing continued business from facilities (some of whom threatened to terminate their relationships).  Relator explained that overwhelmingly the most lucrative portion of Omnicare's business is the sale of prescription medications.  (Compl. ¶ 25).  The profit margins from those sales far exceed that from other aspects of the business.  (Compl. ¶ 34).  As a result, it is critical to Omnicare to build and to retain sources of that highly profitable revenue from nursing facilities.  Omnicare knowingly and intentionally made the determination that it was in its best interest to offer these unlawful inducements (*i.e.*, forego a relatively small level of compensation) in order to intentionally induce the facilities to do business or retain their business for the lucrative prescription medication reimbursements.  (Compl. ¶ 48, 58, 74, 78, 83, 87, 109, 119).

## B.    The Allegations, Reasonable Inferences And Further Consistent Facts Are Sufficient To Demonstrate Omnicare Offered Products And Services At Below Fair Market Value Which Constitutes Unlawful Remuneration.

For each of the fraudulent schemes at issue, in which Omnicare provided or offered items or services of value in exchange for continued business, Omnicare argues that there is not enough specificity in the Complaint to show the remuneration was unlawful, because it is unclear

17

whether the items were provided below fair market value.  *See U.S. ex rel. Klaczak v. Consolidated Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006).  Omnicare stretches the pleading requirements too far.  Relator need not prove lack of fair market value at this stage. Moreover, the facts alleged and the reasonable inferences drawn from them demonstrate unlawful remuneration.

One of the overriding themes in Omnicare's argument is that Relator (whom Omnicare discounts as a lowly customer service representative) could not possibly have had knowledge of any of these fraudulent schemes or the unlawful nature of any remuneration.  On the contrary, Relator's job responsibilities required him to interact directly with key management of the facilities he oversaw.  He had been in this business for thirty years, both in private industry and in regulatory capacities.  He knew the management of facilities not only from his work with Omnicare, but in many cases through his past work in the regulatory field as well.  He was intimately familiar with the facilities he oversaw, with their operations, regulatory compliance, purchases, the services they obtained, and with the personnel at each facility.  He had worked in numerous roles in the long-term care industry his entire professional life.  He has direct and personal knowledge of operations and revenues, of the value of services and products provided, all based on his years of working in this industry and seeing it from many different angles.  As a result, he is more than adequately knowledgeable and his allegations are validly based on his own personal experiences and knowledge.

1.     **A/R Conduct.**

Relator alleges Omnicare regularly allowed certain facilities to amass substantial accounts receivable (*i.e.*, forgo collection of invoices for various products and services) in order to induce the facilities to continue doing business with Omnicare.  Omnicare argues the

Complaint is deficient because it does not allege that amounts were "actually forgiven" or ultimately that Omnicare failed to collect them. Omnicare also claims that Relator could not have known about the forgiveness of A/R, because he was aware of only one specific conversation on this exact topic, and was not involved in collection, so he could not have known whether anything was collected. This, however, is a matter of evidence, not pleading. In any event, even this one conversation, in which a facility was told it need not worry about paying its accounts receivable if it continued to do business with Omnicare, is perhaps as specific and direct as any evidence could be of a scheme of unlawful remuneration.

Next, Omnicare claims that because there is no evidence that such accounts were ultimately written off, there could not have been any remuneration. Apparently Omnicare thinks that matters such as cash flow and the time value of money either do not exist or are irrelevant to businesses, particularly nursing facilities that typically operate on the thinnest of profit margins. Whether these accounts were allowed to float for a month, a year or a decade, Omnicare was conferring value to facilities by allowing them to consistently forgo paying their accounts, and instead use that cash flow for other purposes. Moreover, the time value of money alone is improper remuneration and inducement. Finally, the Complaint does contain factual allegations from which it could reasonably be inferred that these accounts were written off in whole or in part. For example, Relator alleges that "Omnicare made the determination that given the substantially more profitable prescription component of its business, it is more beneficial and profitable to Omnicare to offer this inducement in order to secure a steady continuing stream of business for its prescription medications, than to demand payment of these outstanding amounts and risk losing a component of its profitable business." (Compl. ¶ 48).

### 2. Discounts Conduct

Relator alleges that pursuant to the Corporate Integrity Agreement ("CIA"), which requires certain policies and procedures regarding remuneration and financial arrangements, Omnicare instituted policies to charge certain amounts for certain services. Omnicare claims this allegation is "demonstrably wrong" because the specific amounts for specific services were not set forth in the CIA. But there is no question the CIA mandated certain "policies and procedures" be implemented to ensure compliance with the AKS with regard to financial arrangements and remuneration. (Def. Exh. A, p. 6-7). Pursuant to that requirement, policies were implemented setting forth required fair market value charges for particular services. Whether the actual dollar amounts were set forth in the CIA, or were merely instituted pursuant to the CIA, is irrelevant. It was clear, and the reasonable inference is clear, that the fair market value of certain services to the facilities was far in excess of what Omnicare was then charging, and that had to be changed. Despite that, Relator alleges that Omnicare in Illinois refused to make those changes for certain selected facilities, or initially made those changes, and then relented after pressure from the facilities and went back to charging the discounted amounts. (Compl. ¶ 49-58).

### 3. Refunds and Credits Conduct

Relator alleged with specificity, in some cases to the penny, that Omnicare gave certain facilities refunds and credits that were trumped up when those facilities threatened to leave, or if there was a fear they would leave. (Compl. ¶ 59-74). Omnicare claims this cannot be unlawful remuneration unless Relator has evidence that the facilities were not entitled to the refunds or credits. Again, Omnicare blurs the line between pleading and proof. Relator has alleged that there was no legitimate accounting basis for awarding these refunds or credits. (Compl. ¶ 61, 64,

67, 70, 73). Rather, Omnicare was willing to sacrifice an amount of money to which it was legitimately due, and give a manufactured "refund" or "credit," in order to induce the facility to remain a customer. Omnicare cites one case supposedly supporting its argument that lack of factual detail about remuneration schemes justifies dismissal. *U.S. ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 824 (E.D. Tex. 2008). However, in *Foster*, the court emphasized that the relator provided "not one factual detail or example to support this allegation." In the present case, Relator has provided five specific examples, in some cases describing the credit by specific date and exact amount to the penny. These facts and the reasonable inferences from them are more than sufficient to allege that there was unlawful remuneration.

### 4. SigmaCare Conduct

It should go without saying that medical records management is an increasingly time consuming process and a costly burden to many nursing facilities, much the way e-discovery is in the litigation world. SigmaCare is a highly useful and desired electronic medical records management platform, and Relator alleges Omnicare offered this valuable product to favored facilities at a sharp discount. (Compl. ¶ 75-78). Without citation to any case law, Omnicare argues that these allegations fail because there is no allegation of the fair market value benchmark (actual dollar value) for SigmaCare product and no specific allegation of the actual percentage discount, so there is no viable allegation of unlawful remuneration. Relator alleges that this product was offered at a "substantial discount" off of the "regular price." The only reasonable inference here, is that the regular price, (*i.e.* a price people would ordinarily pay in arms-length transactions) is the fair market value, and the substantial discounts from that price constitute unlawful remuneration.

21

### 5. Free Services Conduct

Relator alleges that Omnicare offered substantial ancillary services, and instituted a policy of charging $65 per hour for those services, but that Enloe was successful in skirting that, and offered these services for free. Omnicare argues that Relator failed to allege the value of the services, or why they have to charge for the services at all. First, Relator did allege the value of these services, not a value he made up, but the value Omnicare itself placed on these services: $65 per hour. Relator then alleges that in Illinois, Omnicare was able to get around that and offer these services for free. Omnicare apparently believes that it should be able to offer services valued at thousands of dollars per month for free, and that is has no obligation to charge for items of value provided as an inducement to facilities. The AKS, however, say differently. Omnicare's position that it does not have to charge specifically for services that are built into other charges is an issue for a jury to decide, not for Omnicare to decree by fiat at the pleading stage to avoid ever having to answer for its actions. Relator will be able to prove (though he is not required to do so at this stage) from his vast experience, that these services have demonstrable value to these facilities, and without receiving them from Omnicare for free, they would have to procure them through consultants at substantial cost. That is how the provision of these services constitutes unlawful remuneration.

### 6. Omnicare Foundation Conduct

Here, Relator alleges that Omnicare used its Foundation to funnel so called charitable contributions to causes or expenses of clients from favored facilities. Omnicare claims these allegations fail because there is no allegation of an agreement as to an illicit purpose for the donations. This simply ignores the pleadings. Not only was there an express understanding, but Relator alleges that certain facility owners actually reached out to Enloe and specifically

requested that he funnel donations to them. (Compl. ¶ 85) ("During the last six years, various nursing facility clients of Omnicare have asked Enloe to have the Foundation make payments on the clients' behalf to various organizations or entities.") More than just an understanding of an illicit purpose, it was a direct and explicit *quid pro quo* request, in order to keep securing further business from these favored clients.

## VI. Relator's Complaint Satisfies the Pleading Requirements Of Rule 9(b).

### A. Specific Allegations of Submission of False Claims

Omnicare argues for dismissal because Relator did not give specific examples of actual false claims submitted, the date of the claim, who submitted it, the amount of the claim, where the claim was submitted from and to whom. In the context of a scheme involve reimbursements under Medicare and Medicaid, like the present case, that argument has been expressly rejected. *U.S. ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 705 (N.D. Ill. 2012). In *Gerschrey*, the Court explained as follows:

> Despite Relators' lack of specific knowledge about billings submitted to the government, the fact that most of Generations' patients were receiving government benefits and Generations billed Medicare and Medicaid at a *per diem* rate for each covered patient creates a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government. . . . Relators do not specify in each example whether Generations billed Medicaid, Medicare, or both. Even so, the facts as pleaded support the inference that claims based on fraudulent misrepresentations were submitted to one or both of the government programs. Although there is a slim possibility that the alleged fraud might have been committed only in connection with Generations' "very few" patients with private insurance, at the pleading stage, Relators need not exclude all possibility of honesty.

*Geschrey*, 922 F. Supp. 2d at 705. Omnicare also argues that allegations based on information and belief are inadequate to comply with Rule 9(b).

Here, Relator sets forth the claims and payments in strong detail in over sixteen paragraphs (Compl. ¶ 88-104), and only pleads on information and belief as to one of those

allegations (Compl. ¶ 99), the rough estimate of the total number of claims. There are no allegations on information and belief as to the claim and payments processes overall or the specific explanation of the process by which Omnicare submits claims, so that portion of Omnicare's argument is a red herring.

For example, with regard to Medicaid, Relator explains as follows:

95.     Omnicare provides services to the State of Illinois on a contractual basis through its Medicaid provider licensure program. In the program, Omnicare agreed to provide pharmaceuticals to Illinois Medicaid patients in the nursing facilities it serves, and the Illinois Department of Healthcare and Family Services the ("IDHFS") agreed to reimburse Omnicare at a statutorily-defined rate, plus a fixed dispensing fee, meant to provide Omnicare with a profit.

96.     In order to be eligible to receive Medicaid reimbursements, Illinois pharmacies (including Omnicare's dispensing pharmacies) must . . . agree to the following provisions stated in the application, entitled "Agreement for Participation in the Illinois Medical Assistance Program":

> The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX of the Social Security Act, and also with all applicable Federal and State law and regulations.

This pledge is renewed each year.

97.     Illinois provides reimbursement for Medicaid providers via an electronic or paper-based claims process. The Medicaid claim form . . . contains a mandatory certification that the provider has complied with all laws and regulations pertaining to Medicaid, including the Federal Anti-Kickback Statute.

98.     In Illinois, at least once per day, when each Omnicare facility batches its Medicaid claims and submits them electronically to IDHFS, as part of each electronic claim, Omnicare affixes its unique Medicaid provider identification number, which serves as an electronic stamp indicating that . . . Omnicare is in compliance and has complied with all applicable federal and state regulations. Claims are adjudicated instantaneously; Omnicare receives reimbursement on a weekly basis from IDHFS for all approved claims.

99.     Upon information and belief, Omnicare has submitted and continues to submit thousands of such claims for pharmaceutical products dispensed to residents of nursing facilities in Illinois. These claims are the direct result of the contracts it obtains with the help of illegal kickbacks.

Based on these specific allegations, it would be remarkable for any responsible person at Omnicare not to have sufficient notice of the claims at issue based on these allegations. The claims were submitted by each Omnicare facility. They were submitted on Medicaid claim forms, containing a mandatory certification by Omnicare that it has complied with all AKS. The claim form contains a unique Medicaid provider ID number, which constitutes an electronic stamp attesting that Omnicare is in compliance with the AKS. That attestation is false each and every single time the claim is submitted for the relevant time period because Omnicare was not in fact in compliance. The claims are submitted at least once per day. They are mostly submitted electronically. The claim is processed automatically, and Omnicare receives payment on a weekly basis resulting from these false claims.

Relator has done more than provide specificity as to some or a few false claims. He has demonstrated that every day, Omnicare has submitted false claims, and explained how that was done, when, where, why and to whom, how and when payment was received and why the claim was false. *U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, 2002 WL 34543515, *4 (N.D. Ill. Dec. 5, 2002) ("[relator] has done better than point to a single fraudulent bill—she has explained how several specific billing practices led to hundreds of thousands of fraudulent bills."). The Medicare/Medicaid process is not similar to an instance in which a party fails to issue a rebate for returned merchandise, or charges the government on an invoice for services that were not performed, or a hospital in a particular incident received double payment for one service,[3] or some other more individualized or isolated incident or process. The claims here are routinized and highly formulaic, submitted the same way dozens, hundreds or thousands of times over. *Trombetta*, 2002 WL 34543515 at *4 (finding that Rule 9(b) was satisfied as false claims when the relator alleged facts as to the "the mechanics of Medicaid and Medicare

---

[3] *See U.S. ex rel. Soulias v. Northwestern Univ.*, 2013 WL 3275839, *4 (N.D. Ill. June 27, 2013).

reimbursement"). Omnicare seems bent on demanding some form of super-pleading or actually demanding the submission of incontestable, admissible evidence to definitively prove a case, before it should even have to answer allegations. No court has ever required that.

Rather, courts in this Circuit have recognized "the importance of balancing detail with flexibility in applying the Rule 9(b) standard, criticizing courts and litigants that cling too tightly to the incantation of 'who, what, when, where, and how,' rather than understanding that the information required of a plaintiff will differ in each case." *Geschrey*, 922 F. Supp. 2d at 705-06. Here, Relator has pled more than sufficient detail of the false claims.

### B. Specific Allegations As To The Schemes.

"Rule 9(b) does not require a plaintiff to plead evidence and is to be read in conjunction with Rule 8, which requires a short and plain statement the claim." *Trombetta*, 2002 WL 34543515 at *3. Where the fraudulent schemes are extensive and occur over a number of years, less exacting detail is required. *Id.* Omnicare begins by arguing the Complaint is deficient because the names of the facilities are not identified. That was a measure done for the privacy of the case, and is easily remedied by the fact that Relator has now attached and disclosed that information. (Rel Exh. 1). In addition, the "who" requirement is designed only to identify which defendants were engaged in which schemes, not the identities of counter-parties. *Id.*; *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 929 F.Supp. 2d 807, 819-20 (N.D. Ill. 2013) (finding that the "who" element was satisfied because the complaint identified which defendants made the false statements). Omnicare is the only defendant, and was engaged in each scheme, and in multiple instances, Relator went further and identified specific people at Omnicare (*e.g.*, Enloe and Patrice Johnson).

26

The remainder of Omnicare's arguments fall in the nature of demanding hyper-technical compliance with the what, when, etc., when courts caution against such rigid adherence to this formulation. For example, Omnicare claims the allegations about the Omnicare Foundation Conduct are not specific because they do not specify when they occurred. The Complaint is clear that the time period at issue for most of the allegations was January 2009 to December 2011, when the Complaint was filed, and no more than the preceding six years. In *Trombetta*, the time period was identified as 1989-1998 (nine-year period) and the court found that adequate. 2002 WL 34543515 at *4.

Omnicare also claims the allegations of "where" are inadequate. Omnicare knows the location of its offices. It is also clear that all of the facilities at issue are in Illinois. Now that the identity of each facility is disclosed, the location of the facilities is at a minimum capable of being inferred or publicly available. The "where" element is satisfied when the location from which the claims were submitted is known, here the Omnicare offices. *Trombetta*, 2002 WL 34543515 at *4.

Next Omnicare argues that the Discounts Conduct fails on the "what" prong, because it does not allege what was fraudulent. Providing services at a rate well below their fair market value, as determined by the company after reflection and analysis following the CIA, and doing so as unlawful remuneration designed to secure or retain business for sales reimbursable by the government, is the what. Relator has alleged several specific examples of this practice. Nothing more is required. *Trombetta*, 2002 WL 34543515 at *4 (finding allegations sufficient when several particular examples were alleged).

With regard to the Refunds and Credits, Omnicare repeats its allegation from the 12(b)(6) argument that there is no allegation that these credits were not earned. The allegation is that

27

there was no legitimate accounting basis for the credits. Relator should not be required to tender financial reports showing the metrics and valuations and specific dollar amounts at this pleading stage. The reasonable inference is that the credit was trumped up for the purpose of trying to sweeten the deal for clients on the edge of departure.

Then, Omnicare demands the exact dollar amount of the SigmaCare discounts. No case law supports the notion that actual accounting figures must be part of the allegations. That is an item of evidence at trial not a pleading requirement. Omnicare revels in its protected posture of being the keeper of these specific details regarding these extensive fraudulent schemes, then seeks to knock Relator out at the pleading stage for failing to produce the specific dollar amount. Those details can be gathered through discovery, but Omnicare wants there to be no discovery. In Omnicare's pleading world, the complaint is all or nothing. Either the Complaint reveals all of the evidence needed to argue to a jury, or it is dismissed. That is a protectively insulating and highly desirable pleading standard for defendants, but it is not the law.

## VII. Conclusion

The allegations of A/R Conduct are not barred because they are materially different in from those in the *Ruscher* case and place the government on notice of new and importantly distinct types of fraud, which *Ruscher* failed to do. The allegations of the Discounts Conduct are not barred because the subpoena at issue does not qualify as a public disclosure, the *Maguire* case presents no bar, and the Relator is an original source of the allegations in any event.

Relator has adequately pled the causes of action at issue and pled sufficient detail as to the fraudulent schemes, the ways in which they were carried out, the ways in which those schemes violated the AKS, and the ways in which those violations resulted in submission of false claims. To the extent that any of the allegations do fall short in one way or another, Rule 15

28

allows that amendments should be liberally allowed. *See Chovanec*, 600 F.3d at 365 (providing that a *qui tam* case should be dismissed without prejudice if the relator can frame amended allegations that would withstand a motion to dismiss).

WHEREFORE, Plaintiffs, the United States of America and the State of Illinois, *ex rel.* Alan J. Litwiller, respectfully request that this Court deny Defendant's Motion to Dismiss, and grant such further and additional relief as this Court deems just.

Respectfully submitted,

**The United States of America and the State of Illinois,** *ex rel.* **Alan J. Litwiller**

By: /s/ Kevin J. Clancy
      One of Relator's Attorneys

Robert H. Smeltzer
Kevin J. Clancy
Lowis & Gellen LLP
200 West Adams, Suite 1900
Chicago, Illinois 60606
(312) 364-2500

CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November 2013, I electronically transmitted the

foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of

a Notice of Electronic Filing to the following CM/ECF registrants.

/s/ Kevin J. Clancy

| Defendant's Counsel | Plaintiff USA's Counsel |
|---|---|
| Denise M. Ware, Esq.<br>REED SMITH LLP<br>10 South Wacker Drive<br>40th Floor<br>Chicago, Illinois 60606<br>(312) 207-3880<br>dware@reedsmith.com | United States Attorney's Office (NDIL)<br>219 South Dearborn Street<br>Suite 500<br>Chicago, Illinois 60604<br>USAILN.ECFAUSA@usdoj.gov |
| Katherine J. Seikaly<br>Eric A. Dubelier<br>REED SMITH LLP<br>1301 K St. NW<br>Suite 1100 – East Tower<br>Washington, DC 20005<br>(202) 414-9219<br>kseikaly@reedsmith.com<br>edubelier@reedsmith.com | |

30